122 N.J. Super. 51 (1973)
298 A.2d 715
HANOVER INSURANCE GROUP, PLAINTIFF,
v.
PHILIP CAMERON, ROSEMARY KARL, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF EDWARD J. KARL, DECEASED, PETER SCHLOEMP, STEPHEN E. GOGGIN AND ALBERT CHRONE, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided January 8, 1973.
*54 Mr. Anthony G. Wahl for plaintiff (Messrs. Vogel, Chait & Wacks, attorneys).
Mr. Howard C. Trueger, attorney for defendant Philip Cameron.
Mr. Brian M. Laddey for defendant Rosemary Karl (Messrs. Porzio, Bromberg & Newman, attorneys).
Mr. David B. Rand for defendants Peter Schloemp, Stephen E. Goggin and Albert Chrone (Messrs. Schenck, Price, Smith & King, attorneys).
STAMLER, J.S.C.
This declaratory judgment action brings into sharp focus the problems anticipated by Burd v. Sussex Mutual Ins. Co., 56 N.J. 383 (1970), along with those beyond the contemplation of the Burd decision.
Difficult questions of grave concern are posed to judges in calendar control. The financial burdens imposed upon plaintiffs in personal injury cases impatiently looking to the trial in the Law Division, the uncertain plight of the insured in determining whether he will be required to provide his own defense, and the distance and the manner in which the insurer may travel on behalf of the insured in investigating and participation in pretrial discovery, are just some of the problems. The most difficult problem is the continued legitimacy of the "reservation of rights" agreements between insurer and insured approved by the Supreme Court in Burd, supra, and Merchants Indemnity Corp. of New York v. Eggleston, 37 N.J. 114 (1962).
In attempting solutions this court is mindful of the limitations imposed upon trial courts in Reinauer Realty Corp. v. Paramus, 34 N.J. 406, 415 (1961).
The timing of both the Law and Chancery Division suits is significant. The proceedings in the Law Division case (Rosemary Karl, individually and as executrix of the estate of Edward Karl, deceased v. Cameron, L-11405-70) disclose in relevant part:
*55 1. Complaint filed December 18, 1970.
2. Summons dated December 21 and December 28, 1970.
3. Summons served on: defendant Cameron January 11, 1971; defendant Chrone, December 30, 1970; defendant Goggin December 31, 1970; defendant Schloemp December 21, 1970 (by mail).
4. Answer filed by all defendants except Cameron, March 3, 1971.
5. Order directing Cameron to file answer, May 6, 1971.
6. Answer filed by Cameron, May 11, 1971.
7. Notice to file pretrial memorandum, January 18, 1972.
8. Notice of trial mailed March 13, 1972.
9. Notice of motion by Cameron for stay of Law Division action pending Chancery Division determination or, alternatively, relieving counsel. (Arguments on the motion heard on May 17, 1972; meeting May 24, 1972, assignment judge, Chancery Division Judge and all counsel in both actions).
10. Order staying Law Division action pending determination of Chancery Division action entered June 6, 1972. (Pretrial discovery was conducted in interim periods and the case was on the Law Division calendar call a number of times).
The Chancery Division proceedings in the present case, Hanover Ins. Co. v. Cameron, (C-1280-71), in relevant part reveal:
1. Complaint for declaratory judgment by insurer filed only against the insured on December 29, 1971.
2. Summons served on Cameron January 10, 1972.
3. Answer for Cameron by Legal Aid Society filed April 4, 1972. (Meeting of May 24, 1972 referred to above.)
4. Consent order to amend complaint to include all indispensible parties filed May 31, 1972.
5. Amended complaint filed May 31, 1972.
6. Order accelerating discovery, establishing timetable and fixing September 22, 1972 as date for pretrial conference filed July 10, 1972.
7. Answers by all additional defendants to amended complaint filed July 13 and July 19, 1972.
8. Pretrial order entered September 22, 1972 fixing trial date as November 27, 1972.
9. Trial in Chancery Division November 27, 1972.
10. Decision reserved November 29, 1972. (Discovery was conducted strictly in accordance with the order of July 10, 1972.)
Hanover in its complaint demands a determination that it is neither obligated to pay nor obligated to defend notwithstanding the issuance to Cameron of a homeowner's Policy which was in effect on the date of the incident which gave *56 rise to the Law Division action. (However, Hanover at the pretrial offered to defend, using counsel of its choice.) The disclaimer is based on Hanover's contention that Cameron's act which resulted in the death of Karl was an intentional act excluded from coverage. All codefendants in the Chancery Division action (plaintiff and all defendants in the Law Division action) take the position that Cameron was covered. Defendants also contend that even if he were not covered, Hanover cannot disclaim because of the equitable grounds of estoppel, waiver, unclean hands and the unenforceability of a "reservation of rights" agreement signed by Cameron.
When an insurance company by way of declaratory judgment action seeks an adjudication of noncoverage, it has the burden of proof of the facts alleged in the complaint. Concord Ins. Co. v. Miles, 118 N.J. Super. 551 (App. Div. 1972). This burden shifts only if and when the court must consider any affirmative defenses.
As to Hanover's disclaimer, the following findings of fact and conclusions of law are made:
On February 8, 1968 Hanover issued a standard homeowner's Policy to Cameron. It was for a term of three years. The following excerpts are relevant to the main issue:

1. COVERAGE E  PERSONAL LIABILITY
(a) Liability: To pay on behalf of the Insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage, and the Company shall defend any suit against the Insured alleging such bodily injury or property damage and seeking damages which are payable under the terms of this policy, even if any of the allegations of the suit are groundless, false or fraudulent; but the Company may make such investigation and settlement of any claim or suit as it deems expedient."

* * *

SPECIAL EXCLUSIONS
SECTION II OF THIS POLICY DOES NOT APPLY:
(c) * * * under Coverages E and F, to bodily injury or property damage caused intentionally by or at the direction of the Insured; * * *.
In late November or early December 1968 Cameron was in the sauna in the Madison Y.M.C.A. One other person was *57 present in the sauna and, as Cameron later related to Y.M.C.A. officials and a Madison police officer, this other person not known to Cameron made physical homosexual advances. These were thwarted by Cameron's hurried departure from the sauna area. A week or so thereafter Cameron reported the incident to defendant Schloemp, physical director of the Y.M.C.A. Cameron was unable to identify the man in the sauna bath. Schloemp advised Cameron that he should see the man again, Schloemp was to be notified and Cameron was to point him out to Schloemp.
On December 19, 1968 Cameron related the incident to a friend of his, a Madison police officer on routine foot patrol. Cameron received the same advice from the police officer. However, when questioned by Cameron as to what he could do to repel a physical advance, the police officer advised that if Cameron were unable to "get away from him because he won't let you go, that you have a right to defend yourself even if you have to hit him * * *." The officer's report contained the following: "Cameron told me that the guy was real big, and that he didn't want any part of him."
During the weeks that followed Cameron was at the sauna on a number of occasions but did not see the man.
On January 6, 1969, at approximately 7:15 p.m., Cameron asked Schloemp to open the sauna bath for him. While Cameron was in the sauna, a young man joined him. This young man and Cameron were in the sauna when the individual that both Cameron and Schloemp sought to identify joined them. The youth left, leaving Cameron and the man alone in the bath. When the man spoke to him and offered him a ride home, Cameron replied that he had his own car and immediately left the sauna and went to the shower room where he showered. He then proceeded to his locker and dressed. Cameron next went upstairs to Schloemp's office and told him that he now could point out the man to Schloemp. Schloemp described Cameron as being very excited. Schloemp preceded Cameron down the stairs to the locker room area. *58 Schloemp passed the open door to the sauna room and continued to the shower-locker area. As Cameron passed the entrance to the sauna, he saw the man emerging and shouted "There he is." Cameron suddenly raised his arm and pointed his finger, which was now quite close to the face of the approaching man. According to Cameron, the man's right hand suddenly came up and Cameron reacted to the sudden movement by swinging his arm. The man fell unconscious on the floor and both Schloemp and Cameron attempted to aid him. The man was later identified as Edward Karl. The Madison police were notified and Karl, severely injured, was taken by ambulance to Morristown Memorial Hospital. Statements were taken by the police the next day from Schloemp and Cameron. Karl died 11 months later on December 6, 1969, never having regained consciousness.
On December 18, 1970 Karl's widow, individually and as executrix, filed the complaint in the Law Division against Cameron, Schloemp and two other employees of the Y.M.C.A. As to Cameron the complaint alleged that he "did negligently and wantonly" strike Karl. Hanover had been notified of the incident on April 9, 1969. It takes the position that Cameron's action was intentional and falls clearly within the exclusionary clause of the policy quoted above.
Defendants collectively assert that since the complaint in the Law Division only alleges "negligent and wanton" conduct and not "intentional" conduct, Hanover cannot disclaim coverage. Although in some jurisdictions a carrier may be so foreclosed, at least in its duty to defend, in New Jersey Burd, supra, is the governing authority and permits the insurer in a separate action to prove that the conduct actually fell within an exclusion of the policy. In Burd the court stated that "* * * the duty to defend may depend upon the actual facts and not upon the allegations in the complaint." 56 N.J. at 388. Hanover's position is supported by Burd when, as here, the factual issue of coverage or exclusion will not be resolved in the trial of the third party against the insured. Chief Justice Weintraub states in Burd that the *59 Supreme Court will not direct the timing of the declaratory judgment action when he states, "We think the better course is to leave it to the contenders to decide for themselves if and when to sue." Id. at 392. See Glens Falls Ins. Co. v. American Oil Co., 254 Md. 120, 254 A.2d 658 (Ct. App. 1969), where after a verdict founded in negligence against the insured in a third-party action, the court permitted the carrier to litigate against the insured as to whether the act was intentional. Due process requires that Hanover have its day in court on this issue.
From the proofs before this court it is required to determine whether the act of Cameron fell within the exclusionary clause. Hanover takes the position that all it need show for the exclusionary clause to be effective is that the insured intended to inflict harm on the injured party. Defendants argue that the clause is operative only when the insured inflicts an injury actually intended to be inflicted. In Hanover's summation counsel described Cameron as "essentially a simple and honest man" who "wishes he [Cameron] didn't want to hurt him [Karl]." In its brief Hanover acknowledges: "It would seem that the language of the [exclusionary] clause applies to injury which was intended as opposed to injury resulting from an act which was intended." The carrier admits that one interpretation of the clause, although perhaps not the best one, permits one to read it as requiring the insured to intend to commit the injury which resulted.
There are two cardinal rules applicable in the interpretation of insurance contracts. First, ambiguities are resolved in favor of the insured. Bryan Construction Co., Inc. v. Employers' Surplus Lines Ins. Co., 60 N.J. 375 (1972). Second, exclusionary clauses are to be strictly interpreted. Butler v. Bonner & Barnewall, Inc., 56 N.J. 567, 576 (1970); Chicago Ins. Co. v. Security Ins. Co. of Hartford, 111 N.J. Super. 291, 295 (App. Div. 1970). Using these standards for construction, Hanover must show that defendants' contention as to the meaning of the clause was entirely unreasonable. As long as defendants' interpretation is reasonable, the exclusionary clause should be inapplicable.
*60 There is a distinction between a "wanton" act and an "intentional" act. Prosser describes the difference in his treatise on torts:
Lying between intent to do harm, which * * * includes proceeding with knowledge that the harm is substantially certain to occur, and the mere unreasonable risk of harm to another involved in ordinary negligence, there is a penumbra of what has been called "quasi intent." To this area the words, "willful," "wanton" or "reckless" are customarily applied; and sometimes, in a single sentence, all three [these terms] apply to conduct which is still merely negligent, rather than actually intended to do harm, * * *" [Prosser, Torts (4th ed. 1971), § 34, at 184]
Although generally following this definition, our courts have added, at various times, translations or interpretations that add or subtract a variety of ingredients which tend to make the distinction obscure. Cf. McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970); Krauth v. Geller, 31 N.J. 270, 277 (1960); Tabor v. O'Grady, 61 N.J. Super. 446, 454 (App. Div. 1960).
In other jurisdictions there is no consistency in defining an injury caused intentionally. A few examples follow:
Putnam v. Zeluff, 372 Mich. 553, 127 N.W.2d 374 (Sup. Ct. 1964): insured's son while camping "shot from the hip" at what he believed was an attacking wild dog. He shot while excited and frightened. The shot killed the pedigreed dog. The question was the boy's total intent and whether he intended to destroy the animal or stop its onrush. That is, the injury inflicted had to be intended.
Baldinger v. Consolidated Mutual Ins. Co., 15 A.D.2d 526, 222 N.Y.S.2d 736 (App. Div. 1961), aff'd 11 N.Y.2d 1026, 230 N.Y.S.2d 25, 183 N.E.2d 908 (Ct. App. 1962); damage action for assault and battery by six-year-old on infant. Policy had exclusion for injuries "caused intentionally." The court held the injury for which judgment was entered was not caused intentionally but was rather the unintended result of an intentional act. See also Wigginton v. Lumbermens Mutual Cas. Co., 169 So.2d 170 (La. App. Ct. 1964); American Ins. Co. v. Saulnier, 242 F. Supp. 257 (D.C. Conn. 1965); Morrill v. Gallagher, 370 Mich. 578, 122 N.W.2d 687 (Sup. Ct. 1963).
Since it must be accepted that there is a distinction, even though vague, between wanton conduct and intentional *61 conduct, this court accepts the definition of "intent" as used in Restatement, Torts 2d, § 8a (1965):
The word "intent" is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.
Thus, the distinction is that to be intentional the consequences must be substantially certain to result, and while only probably certain, to result in wanton acts. As comment (b) to the Restatement notes, as the probability that the consequences will follow decreases and becomes less than substantial certainty, the actor's conduct loses the character of intent and becomes mere recklessness.
Hanover, argues that the absence of the article "the" immediately preceding "bodily injury" in the exclusionary clause means it is not necessary that the insured intended "the bodily injury" which he visits upon the injured party, but rather that the insured merely intended to inflict harm. Whether the article "the" is present or not, the exclusionary clause can reasonably be read so that the harm incurred is what is meant. The clause in question uses the word "injury" and not the word "act." To sustain Hanover's interpretation the clause would have to be read, "This policy does not cover any bodily injury which was intended. * * *"
Guided by the rules of construction of insurance policies, and from the particular facts in this case, it is concluded that the exclusionary clause is not available to Hanover if a judgment be recovered against Cameron by plaintiff in the Law Division action.
This determination should render it unnecessary to consider the affirmative defenses. However, there are three reasons which make it necessary to consider them. First is that since the trial presented these defenses, should an appellate tribunal disagree with the trial court in its interpretation, a remand might not be necessary for consideration of the affirmative defenses. Second is this court's disposition *62 with regard to "reservation of rights" agreements. Third is the growing practice of insurance companies to delay until threshold of trial of the Law Division damage action the filing of a declaratory judgment complaint and then move, as it did in this case, for a stay in the Law Division. This practice has also been criticized in other jurisdictions. In Zurich Ins. Co. v. Rombough, 384 Mich. 228, 180 N.W.2d 775 (1970), the Michigan Supreme Court, in discussing a declaratory judgment action by an insurance company seeking to have coverage determined, said:
Although the above disposes of the instant case, we feel compelled to speak out against a practice which has unnecessarily delayed the trial of the law action brought by plaintiff Latz in the circuit court for the county of Clinton on September 9, 1965. Regardless of whether Latz is entitled to a judgment for damages, the progress of his case should not have been stopped while a nonparty insurer contests, in a separate action, its obligation to defend defendant Rombough.
The declaratory judgment procedure was not intended as a weapon to be used against a plaintiff in this manner. Such practices add to the civil case backlogs and waste of judicial time. Such actions are causing the public to rapidly lose confidence in the judiciary's ability to handle litigation.
For the above listed reasons we are of the opinion that the evils occasioned by delay of the main action will in most cases far outweigh the benefit to the insurer of a prior judicial declaration of its obligations to the defendant. Accordingly, to delay trial of plaintiff Latz' action while processing a declaratory judgment may well constitute an abuse of judicial discretion.
Plaintiff-appellant Zurich Insurance Company shall defend Rombough in the Latz case and the circuit court for the county of Clinton is instructed to grant immediate trial in the negligence action.
See also Allstate Ins. Co. v. Mahan, 448 S.W.2d 392, 394 (Tenn. Sup. Ct. 1969).
This practice, if permitted to continue, delays the injured party's day in court and confuses the trial calendar.
In making findings of fact as to the affirmative defenses, the testimony adduced at the trial and the voluminous Hanover inter-office memoranda and letters to and from counsel from Hanover are compacted. It ineluctably leads to one *63 resolution: those who were representing Hanover (adjuster, claims manager, home office and others) were out to establish that Cameron was guilty of a crime which would then relieve Hanover of coverage responsibility.
It will be recalled that the incident at the Y.M.C.A. occurred on January 6, 1969. On April 9, 1969 Hanover was notified of the incident by the insured's personal attorney. The claims manager assigned an adjuster inexperienced in investigation. The adjuster and claims manager agreed that
There is no question that if insured committed assault and battery, that there would be no coverage as there is a specific exclusion in the policy to this effect that any assault and battery committed by insured or by direction of insured is excluded.
This documentation was made before the adjuster had interviewed the insured and had made little or no investigation.
On July 14, 1969 the adjuster met with Cameron and his personal attorney. In a signed statement given to the adjuster, Cameron said that Karl "made a movement with his hands, it appeared to me that he was going to strike me." On the very same day, and with no further investigation, the adjuster reported to the claims manager. The report reads in part:
2. COVERAGE: There definitely does appear to be a question of coverage in this matter as the insured committed an act of assault and battery on the claimant which we will elaborate under captioned liability.
Although the adjuster suggested witnesses be interviewed and the investigation be continued, the claims manager apparently disagreed, for nothing more was done for some time.
On August 8, 1969 Hanover wrote to Cameron and in part said:
It should be understood that our activities in investigating this claim are not to be construed as a waiver of any rights which we may have to deny coverage by reason that the injury to the claimant was caused by an assault committed by yourself, or for any other reason which may become apparent during investigation of this claim. *64 Cameron certainly had the right to assume from this letter that an investigation was being conducted. Nothing more took place until after the Law Division complaint was filed. One month later in a letter Hanover retained trial counsel to "protect our interests in this matter."
On January 25, 1971 Hanover, still equivocating on coverage, took the adjuster's advice given on July 14, 1969 and renewed its "investigation." On February 3 Hanover asked the trial attorney for an opinion "as to whether our exclusion on an intentional act would stand up in this instance." On the same day Hanover assigned the claim of Karl against Cameron to a qualified investigator for the first time. Among other instructions the investigator was directed "to check into the background of our assured especially as to his pugnacious tendencies." On February 9 the trial attorney for Hanover notified Cameron's personal attorney of his opinion that the assured was not covered. This letter stated in part that "All of the investigation would clearly substantiate that Mr. Cameron intentionally committed an assault and battery upon the decedent." The trial attorney then expressed his concern that if he interposed an answer for Cameron it would later be claimed that Hanover "pursued a path that amounted to a conflict of interest."
On February 10 trial counsel suggested to Hanover that a "reservation of rights" agreement should be obtained, that an answer should be filed in the Law Division, and that a declaratory judgment action should be immediately filed which would result in the staying of the Law Division action.
On March 15, 1971 Cameron, on advice of his personal attorney, on assurance by Hanover of a continued investigation which might be helpful to him, and on the further assurance that Hanover would have the coverage determined in a declaratory judgment action, signed the "reservation of rights" agreement.
An answer in the Law Division action was filed on behalf of Cameron by Hanover's trial counsel on May 11, 1971. *65 Discovery, by way of oral deposition, attended and participated in by the carrier's trial attorney, was of no real assistance in defense of Cameron.
Hanover continued to equivocate. On December 29, 1971 the Chancery Division action was filed. It was not until after the Law Division case was called for trial that Cameron received a letter from Hanover which advised him that the carrier had agreed to defend him "under the provisions of the policy but will not be responsible for any judgment that might be rendered against you." This was written May 10, 1972. On May 24, 1972 the assignment judge, the Chancery Division judge and all attorneys held the conference referred to at the outset of this opinion.
Under the policy Cameron was immediately entitled to some aid. The carrier is obligated to commence by immediate investigation the defense of the insured at the time it first learns of the accident. Hanover did not comply with this obligation.
In Merchants Indemnity Corp. of New York v. Eggleston, 37 N.J. 114, supra, the court stated that, among other things, success absolute or relative may depend upon skill in investigation. Hanover's performance in the investigative stage was directed primarily to whether or not it had to provide coverage. It does not appear that an investigation for the benefit of Cameron was made at any time. Why were not potential witnesses sought out? To this day the third man in the sauna has not been interviewed. Other witnesses have left the jurisdiction.
Usually a necessary element of estoppel is proof prejudice. But in a case of this nature, it is extremely difficult to prove prejudice when the insured is deterred by faulty and misdirected investigation. Cf. Reliable Newspaper v. Maryland Cas. Co., 131 N.J.L. 424 (E. & A. 1943). In Merchants Indemnity Corp., supra, it is indicated that prejudice need not be actually proven by the insured since "the course cannot be rerun."
*66 It is concluded that in the case at bar prejudice sufficient to estop Hanover's claim of noncoverage has been shown both in fact and in law. This is so notwithstanding the reservation of rights agreement. 3 Pomeroy Equity Jurisprudence (5 ed. 1941), § 804. See LoRocco v. N.J. Mfrs. Indem. Ins. Co., 82 N.J. Super. 323 (App. Div. 1964); Ebert v. Balter, 83 N.J. Super 545 (Cty. Ct. 1964).
Although agreements of "reservation of rights" have been generally approved by our Supreme Court, such agreements may have a questioned place in our judicial approvals. Such contracts, like insurance contracts, are contracts of adhesion. The insured has given up a valuable right in respect to control of investigation, negotiation and defense. Sneed v. Concord Ins. Co., 98 N.J. Super. 306, 314 (App. Div. 1967). What has the carrier surrendered?
What appears to be the majority view was recently set forth in McAlear v. St. Paul Ins. Co., 493 P.2d 331 (Mont. Sup. Ct. 1972). There it was said that the allegations in a ocmplaint against an insured determine whether there is coverage. Where the complaint is clearly not within the coverage and the insurer is not obligated to indemnify, the insurer has no duty to defend. This is consistent with Burd v. Sussex Mutual Ins. Co., supra, where it was said:
* * * the duty to defend may depend upon the actual facts and not upon the allegations of the complaint * * *
The obligation to defend "groundless, false or fraudulent" claims does not mean the carrier will defend claims which would be beyond the covenant to pay if the claimant prevailed. It means only that a carrier may not refuse to defend a suit on the ground that the claim asserted against the insured cannot possibly succeed because either in law or in fact there is no basis for a plaintiff's judgment." [56 N.J. at 388; emphasis supplied.]
Consider the example given by our Supreme Court in Burd: the insured owned an automobile insurance policy on his Ford but not his Chevrolet. The claimant mistakenly pleaded that the insured drove the Ford, when actually he was driving the uninsured vehicle. In this instance the insurer *67 is not obligated to defend. The policy did not cover the accident. It is as if a person owned two homes, one insured and the other uninsured against fire. If the uninsured house burns down, it would be ridiculous to assume that the insurance company would be responsible for the loss on the uninsured home.
This is not the case at bar. Hanover asserts grounds of noncoverage, not because the policy does not in any way, shape or form cover the alleged incident, but asserts noncoverage solely on the exclusionary clause. In the example cited in Burd, the policy never came into effect. Here, Hanover's policy came into effect along with all its provisions, including the obligation to defend. In the example in Burd the policy obligations were never triggered because the insurance company insured an auto not involved in any incident and the defense provisions were never activated.
Therefore, if Hanover did have a duty to defend, Hanover did not provide any new consideration for the "reservation of rights" agreement. This view is consistent with the cardinal rule that the interpretation that best protects the insured should be adopted. It is concluded that the "reservation of rights" agreement signed by Cameron for the benefit of Hanover is unenforceable.
Further, this court questions the public policy in judicial approval of a "reservation of rights" agreement. To permit a carrier to take up an insured's defense, and then through the control of investigation and discovery prove the injured party's claim to a point where the carrier can claim exclusion, would encourage insurers to stall settlements and create chaos in a court calendar. Each trial lawyer under the protective umbrella of a reservation would be placed in the untenable position of a conflict of interest. See DR5-105(B).
Our Supreme Court has ruled that "reservation of rights" agreements are valid. It did not say that all were enforceable. It is suggested by this trial court that if appropriate at all, a "reservation of rights" agreement should be limited to a right of disclaimer for facts in dispute between *68 carrier and insured, such as late notice, lack of cooperation, etc. These factors are not concerned with the investigation of facts relating to the defense of the injured person's claim.
It is concluded that a judgment be entered declaring that Hanover has the obligation to defend and to pay in accordance with the terms of its policy. Since the trial attorney has taken the position that Cameron's act was an intentional harm, he cannot very well provide Cameron an adequate defense to protect him at trial. The judgment shall therefore provide that upon motion by Cameron this court will appoint a qualified attorney to defend Cameron with single fidelity, the cost and expenses of which are to be born by Hanover.
Costs of this action taxable against Hanover.