so ruling the bankruptcy judge abused his discretion.

What is left, therefore, is the Commonwealth's contention that some affirmative burden, beyond the showing made in the report of the standing trustee, was required because the plan provided for only nominal payments to unsecured creditors. The adoption of such a rule would be inconsistent with the authorities cited in the margin, which we approve.

The judgment appealed from will be affirmed.[2]

The FIRST JERSEY NATIONAL BANK, Appellee in No. 82–5620, Appellant in No. 82–5662,

v.

DOME PETROLEUM LIMITED and Dome Energy Limited, Appellants in No. 82–5620, Appellees in No. 82–5662.

Nos. 82–5620, 82–5662.

United States Court of Appeals, Third Circuit.

Argued July 15, 1983.

Decided Dec. 19, 1983.

Rehearing and Rehearing In Banc Denied Jan. 17, 1984.

2. We have by an order filed simultaneously herewith denied Hines' motion to dismiss the Commonwealth's appeal as moot.

Lee N. Abrams (Argued), Lynne M. Raimondo, Mayer, Brown & Platt, Chicago, Ill., for appellants in No. 82–5620 and appellees in No. 82–5662.

Morrill J. Cole, Steven R. Klein, Cole, Schotz, Bernstein, Meisel & Forman, P.A., Rochelle Park, N.J., for appellants in No. 82–5620 and appellees in No. 82–5662.

Joseph J. Fleischman (Argued), Bronna G. Levin, Robert P. Zoller, Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney, P.A., Newark, N.J., for appellee in No. 82–5620 and appellant in No. 82–5662.

Before SEITZ, Chief Judge, SLOVITER, Circuit Judge and LORD, District Judge.*

## OPINION OF THE COURT

SEITZ, Chief Judge.

### I.

In this diversity case, Dome Petroleum Limited and Dome Energy Limited ("Dome") appeal an order granting a partial summary judgment which directs Dome to indemnify The First Jersey National Bank ("First Jersey"). Dome also appeals

---

* Honorable Joseph S. Lord, III, United States District Judge for the Eastern District of Penn-sylvania, sitting by designation.

the district court's order denying its motion for permission to file a counterclaim against First Jersey for breach of a depositary agreement. The district court certified both orders under Fed.R.Civ.P. 54(b). This court has jurisdiction over Dome's appeals under 28 U.S.C. § 1291 (1976).

First Jersey appeals the district court's order denying First Jersey's claim for legal fees and out-of-pocket disbursements incurred in negotiating the depositary agreement and in litigating this action in the district court. The district court denied this motion by an order dated October 20, 1982. It also certified the order under Fed.R. Civ.P. 54(b). On October 21, 1982, First Jersey served a timely notice of its motion for reconsideration. First Jersey filed a notice of appeal from the district court's order with respect to fees and disbursements on October 27, 1982. The district court denied First Jersey's motion for reconsideration on December 8, 1982.

██ This court has no jurisdiction to hear an appeal if the appellant files its notice of appeal while there is pending a timely motion made pursuant to Fed.R. Civ.P. 59. *Griggs v. Provident Consumer Discount Company,* 459 U.S. 56, 103 S.Ct. 400, 403, 74 L.Ed.2d 225 (1982); *Dougherty v. Lehman,* 711 F.2d 555, 558–60 (3d Cir.1983). Although Rule 59 does not explicitly mention motions for reconsideration, this court has held that for purposes of Rule 4(a), a motion for reconsideration qualifies as a motion under Rule 59(e) to alter or amend a judgment. *Richerson v. Jones,* 572 F.2d 89, 93 (3d Cir.1978). Because First Jersey filed its notice of appeal before the district court disposed of First Jersey's timely motion for reconsideration, this premature notice of appeal was a "nullity." *Griggs,* 103 S.Ct. at 403. First Jersey did not file a notice of appeal after the district court denied its motion for reconsideration. We will therefore dismiss First Jersey's appeal for want of jurisdiction.

## II.

This action for indemnification arises from a complex and unfortunate chain of events. Dome made a public offering to buy between 14 and 22 million shares of Conoco, Inc. ("Conoco"). First Jersey served as the depositary for the tender offer. Under the depositary agreement (the "Agreement"), First Jersey had numerous duties, including the duty to time-stamp incoming letters of transmittal and other documents, and the duty to transfer the tendered shares to Dome and to pay the tenderors in accordance with the terms of Dome's offer to purchase.

Conoco shareholders deluged First Jersey with tenders in response to Dome's offer. On May 26, 1981, the number of Conoco shares tendered was more than twice as great as the maximum number of 22 million shares that Dome offered to purchase. In such circumstances, section 14(d)(6) of the Securities Exchange Act, 15 U.S.C. § 78n(d)(6) (1976), requires a tender offeror to purchase an equal percentage of each tenderor's shares, if those shares were tendered prior to the expiration of the proration period.

May 26 was the last day of the proration period for Dome's offer to purchase, which explicitly provided for proration in the event of oversubscription. As part of First Jersey's contractual duty to deliver the Conoco shares to Dome and to pay the tendering shareholders, First Jersey determined which shares were validly tendered before the proration period expired and calculated the proration factor. On June 10, 1981, First Jersey mailed checks to the approximately 9,000 shareholders who had tendered their Conoco shares before the expiration of the proration period. The amount paid to each shareholder depended on the number of shares that Dome purchased from the shareholder, based on First Jersey's proration calculations.

On the last day of the proration period, First Jersey had stopped stamping the incoming letters of transmittal and other documents to indicate the date and time of receipt. The unstamped tenders included approximately 605,000 shares tendered by the State Street Bank and approximately 116,000 shares tendered by seventeen oth-

ers. We will refer collectively to these tenderors as the "State Street Group." Because these shares were properly tendered on May 26, First Jersey should have included them in its calculation of the proration factor, transferred a percentage of the State Street Group's shares to Dome, and sent checks to the State Street Group on June 10. First Jersey did none of these things. Instead, the shares that Dome should have purchased from the State Street Group were purchased in a pro rata proportion from 9,000 other tenderors, and the amounts properly due the State Street Group were scattered in 9,000 directions.

Under the incorrect formula that First Jersey employed, Dome purchased at the offering price 40.26% of the shares tendered by each of the 9,000 shareholders, whereas it should have purchased 39.74% of these shares, plus 39.74% of the shares tendered by each member of the State Street Group. While the offering price was $65 per share, the market price at the time of Dome's purchase was $53. Thus, each of the 9,000 tenderors received a benefit of $12 per share for the .52% of their tendered shares that Dome should not have purchased. This benefit totalled approximately $3.5 million.

One or two days before First Jersey mailed the checks to the other timely tenderors, State Street Bank had called First Jersey to protest First Jersey's return of State Street Bank's shares as untimely tenders. Teresa Ernst, an Administrative Assistant in First Jersey's Special Services Department, checked First Jersey's records, and on the following day, she told State Street Bank that she had found no record of their claimed May 26 delivery. The next day, which Ernst identified as the day on which First Jersey mailed the checks, State Street Bank told Ernst that it would send a copy of its Brink's receipt for the delivery of the shares. This receipt arrived the day after the checks went out, and it was then that First Jersey determined that the tender had been timely.

First Jersey immediately notified its insurance carrier and Dome, and these parties and counsel discussed various possible remedies. Counsel contacted the Securities and Exchange Commission to advise them of the problem and the proposed solutions. The SEC's primary concern seems to have been that all timely tenderors be treated equally.

First Jersey decided to pay the State Street Group the difference between the offering price and the market price for a portion of the shares tendered by each member of the Group. This portion was determined by the same incorrect proration factor (40.26%) that First Jersey had applied to all the other timely tenderors. First Jersey mailed checks totalling approximately $3.5 million to the State Street Group and demanded reimbursement from Dome pursuant to the indemnification clause in paragraph 16.1 of the Agreement.

When Dome refused to pay, First Jersey entered into a loan receipt agreement with its insurer, Employer's Insurance of Wausau, which provided that the insurer would loan First Jersey approximately $3.5 million, to be repaid only to the extent that First Jersey is able to recover from a third party (Dome). First Jersey instituted this action for indemnification to recover the amounts paid to the State Street Group.[1]

■ On review of a summary judgment, we do as the district court was required to do: we determine whether the record as it stands reveals any disputed issue of material fact, assume the resolution of any such issue in favor of the non-movant, and determine whether the movant is then entitled to judgment as a matter of law. See, e.g., Hollinger v. Wagner Mining Equipment Company, 667 F.2d 402, 405 (3d Cir.1981).

### III.

First Jersey does not dispute that it breached an explicit contractual requirement when it stopped time-stamping

---

1. Although by the terms of the loan receipt agreement, First Jersey's insurer has an interest in any recovery, it is not suggested that this action is not being maintained in the name of the real party in interest.

tenders received before the proration period expired. For purposes of reviewing the partial summary judgment, we assume that First Jersey's failure to time stamp, or its failure to ascertain before it mailed checks to the 9,000 tenderors that State Street Bank's tender was timely, caused it to calculate the erroneous proration factor and caused the erroneous purchases and payments.[2] We will also assume that these mispayments breached First Jersey's duty under the Agreement to deliver shares to Dome and to deliver the purchase price to timely tenderors, pursuant to the terms of Dome's offer to purchase. The question is whether under an indemnification clause in the Agreement, Dome must bear the loss caused by First Jersey's "misconduct."

The parties agreed that the Agreement would be construed and enforced in accordance with New Jersey law.

### A. Indemnification for Breaches of Contract.

Dome contends that the meaning of the indemnification clause is a question of fact, wrongly resolved in First Jersey's favor on the motion for summary judgment before the district court. Although this court would agree with Dome that as a general rule the meaning of a contract is a question of fact, *Landtect Corporation v. State Mutual Life Assurance Company,* 605 F.2d 75, 79 (3d Cir.1979), New Jersey courts apparently begin from a different premise, *see Trucking Employees of North Jersey Welfare Fund v. Vrablick,* 177 N.J.Super. 142, 148, 425 A.2d 1068, 1071 (App.Div.1980) ("The construction of a written agreement is ordinarily a matter for the court ....."). Both courts agree, however, that a clear and unambiguous contractual provision raises no factual issue. *Landtect,* 605 F.2d at 79; *Vrablick,* 177 N.J.Super. at 148, 425 A.2d at 1071.

The indemnification clause under which First Jersey brought this action provides:

[Dome] hereby covenants and agrees to indemnify and hold [First Jersey] harmless from and against any and all claims, actions, judgments, damages, losses, liabilities, costs and expenses of any nature whatsoever (including without limitation attorney's fees), arising directly or indirectly from, out of or incident to this Agreement and/or oral instructions delivered to [First Jersey] pursuant to this Agreement. This indemnity shall exclude only intentional and deliberate misconduct on [First Jersey's] part. [Dome] shall be subrogated to, and entitled to assert, any claim which [First Jersey] may have against any third party with respect to any items reimbursed to [First Jersey] hereunder by [Dome].

Agreement ¶ 16.1.

Dome claims that paragraph 16.1 is ambiguous because it does not explicitly state that Dome indemnifies First Jersey for a loss resulting from First Jersey's breach of the Agreement. In the alternative, Dome argues that if paragraph 16.1 is unambiguous, it does not cover First Jersey's breaches of the Agreement.

Under a clear line of contemporary New Jersey cases, parties to a commercial transaction have great latitude in their preferred allocation of risks of loss. *See, e.g., Berry v. V. Ponte & Sons,* 166 N.J.Super. 513, 517, 400 A.2d 114, 116 (App.Div. 1979), *cert. denied,* 84 N.J. 389, 420 A.2d 317 (1980); *Buscaglia v. Owens-Corning Fiberglas,* 68 N.J.Super. 508, 172 A.2d 703, 707 (App.Div.1961), *aff'd on other grounds,* 36 N.J. 532, 178 A.2d 208 (1962); *Cozzi v. Owens Corning Fiber Glass Corporation,* 63 N.J.Super. 117, 125, 164 A.2d 69, 74 (App. Div.1960); *Doloughty v. Blanchard Construction Company,* 139 N.J.Super. 110, 115, 352 A.2d 613, 616 (Law Div.1976).[3] Fur-

---

2. Because we must assume disputed issues of material fact in Dome's favor, we need not consider First Jersey's contention that the loss occurred at least in part because Dome rushed First Jersey through the proration calculations to make certain that Dome would be able to close a deal with Conoco on June 10.

3. Dome supposes that these cases do not apply to losses resulting from the indemnitee's actions. *See* Brief for Appellants at 32. To the contrary, the indemnitee's actions were the sole cause of the harm in *Cozzi* and the concurrent cause of the harm in *Doloughty.*

thermore, under New Jersey law a broadly worded indemnification clause need not also recite the specific sorts of loss within its coverage. As the *Cozzi* court explained, because commercial parties now commonly shift their contractual risk of loss to insurance companies, strict construction of an indemnity provision is anachronistic. 63 N.J.Super. at 125, 164 A.2d at 74.

Under the indemnity clause in *Cozzi*, a contractor indemnified a company (the "Owner") against damages resulting from accidents that might befall the contractor or its employees while they worked on the Owner's property, " 'whether occasioned by said Contractor or his employees or by Owner or his employees or any other person or persons....'" 63 N.J.Super. at 122, 164 A.2d at 72. The contractor argued that the clause was inapplicable to losses resulting from accidents caused by the Owner's negligence. The *Cozzi* court held that because the clause referred to accidents caused by the Owner, it clearly and unambiguously covered accidents caused by the owner's negligence even though it did not specifically refer to such accidents. *Id.* We recognize that *Cozzi* discusses indemnification against negligence, not indemnification against breaches of contract. Nevertheless, it is a useful example of how New Jersey courts will find unambiguous an indemnification clause that does not specifically state the kinds of harm that it covers.

■ Paragraph 16.1 of the Agreement does not specifically refer to breaches of contract by First Jersey. It does, however, refer to misconduct by First Jersey when it explicitly excludes from its coverage *"only* [First Jersey's] intentional and deliberate misconduct ...." (Emphasis added.) We therefore hold that paragraph 16.1, clearly and unambiguously, covers a loss resulting from First Jersey's breach of contract, provided that First Jersey did not engage in intentional and deliberate misconduct.

Dome relies on a case from the Supreme Court of New Jersey and calls to our attention the fact that cases such as *Berry, Buscaglia,* and *Cozzi* were decided by the Appellate Division. In *George M. Brewster &*

*Son v. Catalytic Construction Company,* 17 N.J. 20, 109 A.2d 805 (1954), the lessee of a heavy duty crane boom indemnified the lessor " 'against all loss, damage, expense and penalty arising from any action on account of personal injury or damage to property occasioned by the operation and handling of this equipment....'" 17 N.J. at 25, 109 A.2d at 807. The *Brewster* court held:

The significant words would seem to be "operation and handling" .... And this postulates as an inherent term of the contract the provision of a crane and boom reasonably suitable and safe for the stipulated use when delivered to the indemnitor, and certainly a breach of this condition prerequisite, rendering the indemnitee directly liable in damages for his own negligence, would not be within the coverage of the indemnity clause, absent a clear and unequivocal expression to that end.

17 N.J. at 32, 109 A.2d at 811.

Dome points out that paragraph 16.1 of the Agreement covers losses "arising directly and indirectly from, out of or incident to this Agreement and/or oral instructions delivered to [First Jersey] pursuant to this Agreement." Dome argues that under *Brewster,* these words require, as a condition prerequisite to indemnification, that First Jersey act in accordance with the Agreement. This argument ignores the *Brewster* court's acknowledgment that indemnification for breaches of contract may be provided by "a clear and unequivocal expression to that end." 17 N.J. at 33, 109 A.2d at 811. Because we hold that paragraph 16.1 clearly and unequivocally covers a loss that results from a breach of the Agreement by First Jersey, we agree with the district court that *Brewster* is consistent with the imposition of liability on Dome.

B. *First Jersey's Culpability and Dome's Liability.*

■ Paragraph 16.1 explicitly exempts indemnification against First Jersey's "intentional and deliberate misconduct." Dome argues that whether First Jersey's misconduct was intentional and deliberate

is a disputed issue of material fact. Dome offers evidence that Anthony Rotella, an Assistant Manager at First Jersey, intentionally ordered First Jersey employees to stop time-stamping on the last day of the proration period even though he was aware of the importance of the procedure. Dome also offers evidence to show that Teresa Ernst, the Administrative Assistant to whom State Street Bank complained, intentionally permitted First Jersey to issue the checks on June 10, even though she knew that if State Street Bank's protest were justified, the payments would be inaccurate.

Accepting Dome's contentions as true for the purposes of reviewing the summary judgment, we nevertheless agree with the district court that First Jersey's misconduct was not intentional and deliberate.[4] The court in *Lyons v. Hartford Insurance Group,* 125 N.J.Super. 239, 310 A.2d 485 (App.Div.1973), *cert. denied,* 64 N.J. 322, 315 A.2d 411 (1974), held that New Jersey's public policy of denying insurance indemnity for losses resulting from intentional wrongdoing did not preclude indemnification against "the unintended results of an intentional act." 125 N.J.Super. at 245, 310 A.2d at 488. "[T]he distinction between intended and unintended results of intentional acts is well recognized," *Lyons,* 125 N.J.Super., at 247, 310 A.2d at 489, and this distinction requires Dome to indemnify First Jersey, under the terms of paragraph 16.1, for the unintentional results of Rotella's and Ernst's intentional acts.[5] Because Dome does not claim that First Jersey intended to overpay some tenderors or to fail to pay others, no factual issue with respect to intentional misconduct precludes summary judgment for First Jersey.

Dome argues in the alternative that even if First Jersey's conduct was not intentional and deliberate, it was reckless, willful, or grossly negligent. Dome contends that public policy requires courts to void the contractual indemnification of such conduct. It is not clear that Dome raised this particular public policy argument in the district court. We address it only because it is strongly akin to (if not an amalgamation of) two other public policy arguments which the district court answered and which Dome does not pursue. We will assume for purposes of reviewing the partial summary judgment that First Jersey's conduct was reckless, willful, or grossly negligent.

The district court noted the vital distinction between exculpation and indemnification and held that while public policy may preclude contractual exculpation for reckless, willful, or grossly negligent conduct, it is not offended by indemnification against such conduct. *See* 6A Corbin on Contracts § 1472 n. 52 (Supp.1964); *cf. Hanover Insurance Group v. Cameron,* 122 N.J.Super. 51, 298 A.2d 715 (Chanc.Div.1973) (insurance for negligent and wanton conduct). The loss at issue is the $3.5 million loss suffered by the State Street Group. We will assume for purposes of reviewing the summary judgment that First Jersey's gross negligence or willful misconduct caused this loss. First Jersey did not deny its liability to the State Street Group or seek exculpation. Rather, having made good the loss, it sought indemnification from Dome for a loss to a third party for which First Jersey was liable but which it

---

**4.** Dome's counsel filed an affidavit with the district court to show why Dome could not present facts essential to its opposition to First Jersey's motion for partial summary judgment. *See* Fed.R.Civ.P. 56(f). On appeal, Dome protests that the district court abused its discretion by denying Dome's request for adjournment of the hearing on First Jersey's motion pending the completion of Dome's discovery. Given the assumptions that are made in Dome's favor, we cannot say that the district court abused its discretion by refusing to adjourn so that Dome could further explore how and why the mispayment occurred.

**5.** The rule in *Lyons* won the explicit approval of Justice Pashman in *Ambassador Ins. Co. v. Montes,* 76 N.J. 477, 488–90, 388 A.2d 603, 609–10 (1978) (Pashman, J., concurring), and it is routinely applied in the Appellate Division, *see, e.g., Garden State Fire & Cas. Co. v. Keefe,* 172 N.J.Super. 53, 57, 410 A.2d 718, 720 (App. Div.), *cert. denied,* 84 N.J. 389, 420 A.2d 317 (1980).

did not intentionally or deliberately cause. In such circumstances, paragraph 16.1 requires indemnity.

The most persuasive case in Dome's favor is *Swisscraft Novelty Company v. Alad Realty Corporation,* 113 N.J.Super. 416, 274 A.2d 59 (App.Div.1971). Under the commercial lease in *Swisscraft* the lessee both exculpated the lessor and indemnified it for losses occurring on the leased premises. However, only the lessee (and not some third party) had been injured, and the court focused exclusively on the exculpatory provision when it remanded on public policy grounds to permit a new action for gross negligence and willful and wanton misconduct. Thus, *Swisscraft* is inapposite.[6]

C. *Discharge of the Obligation to Indemnify.*

■ Dome argues that First Jersey had a legal obligation to attempt to recover the overpayments to the 9,000 tenderors. According to Dome, First Jersey's failure to minimize the loss in this manner discharged Dome's obligations as an indemnitor under paragraph 16.1 because First Jersey's course of action increased Dome's risk of loss.

First Jersey did nothing to prejudice Dome's rights or increase its risk of loss, as these terms are used in the cases that Dome cites. *See, e.g., General Insurance Company of America v. Fleeger,* 389 F.2d 159, 161 & n. 3 (5th Cir.1968) (in inducing indemnification, indemnitee misrepresented the degree of risk; indemnitee also increased indemnitor's risk by continuing to issue bonds to defaulting contractors); *American Casualty Company v. Idaho First National Bank,* 328 F.2d 138 (9th Cir.1964) (indemnification given on condition that indemnitor receive a security interest in certain property, which indemnitee subsequently dissipated); *Hiern v. St. Paul-Mercury Indemnity Company,* 262 F.2d 526 (5th Cir.1959) (indemnitor agreed to indemnify against payments that indemnitee might make as surety on contracts; indemnitor learned that funds due

as payments under the contracts were being diverted; indemnitor requested indemnitee to take steps to halt the diversion, and indemnitee falsely told indemnitor it had done so). In each of these cases, the indemnitor had good reason to believe that the potential loss it was risking was less than the loss that actually occurred. If an indemnitee is responsible for putting the indemnitor in such a precarious position, the indemnification may be discharged.

Nothing in the Agreement suggests that Dome conditioned its indemnification on the requirement that First Jersey take particular steps to remedy a loss, and Dome does not contend that First Jersey made misrepresentations to Dome about the course of action that First Jersey decided to pursue. Dome argues, however, that First Jersey failed to follow Dome's instructions in the wake of the disaster.

After First Jersey discovered the overpayments, First Jersey and Dome discussed two recovery plans that First Jersey might follow: it could stop payment on the checks sent to 9,000 tenderors and issue new checks for a lesser amount; or it could refuse to return the tenderors' unpurchased shares until they repaid the overpayments. We will assume for the purposes of reviewing the summary judgment that First Jersey and Dome also considered whether First Jersey might recover the overpayments by simply requesting their return. The parties also discussed the possibility of making the State Street Group whole, without attempting to recover the overpayments.

In its correspondence through counsel, Dome took great pains "not [to] presume to direct [First Jersey] to follow any particular course of action." Although Dome then stated that retention of the unpurchased shares pending the return of the overpayments "appears to be most consistent with the instructions given [First Jersey] in the Depositary Agreement....," *id.* at 703, we have examined the Agreement, and we see no indication whatsoever that the Agree-

---

**6.** We need not decide whether indemnification would be contrary to public policy if First Jersey's acts constituted gross negligence or willful misconduct and First Jersey were a defendant in an action under the federal securities laws.

ment required First Jersey to refuse to return unpurchased shares in the event of an overpayment. After the harm occurred, Dome expressly declined to direct First Jersey's choice of a remedy. Under these circumstances, Dome cannot be heard to say that First Jersey prejudiced Dome's rights or increased its risk of loss.

Furthermore, we agree with the district court that because Dome and Dome's counsel failed to instruct First Jersey to follow any particular course of action, and because First Jersey acted with the advice of its counsel, First Jersey is indemnified under paragraph 12.7 of the Agreement against the consequences of its chosen remedy. Paragraph 12.7 provides:

> [First Jersey] may consult with counsel satisfactory to [First Jersey] (including Mayer, Brown & Platt, United States counsel for [Dome], and Bennett Jones, Canadian counsel for [Dome]), and the advice or opinion of such counsel shall be deemed full and complete authorization by [Dome], which shall protect and indemnify [First Jersey] in respect of any action taken, suffered or omitted by [First Jersey] hereunder in good faith and in accordance with such advice or opinion of such counsel; . . .

Given Dome's refusal to direct First Jersey's choice of a remedy, it cannot be said that First Jersey did not act in good faith in choosing one of the several remedies that it had discussed with Dome.

Dome also refers to First Jersey's duty to mitigate or minimize the loss by attempting to recover the overpayments. Assuming without deciding that First Jersey had such a duty, New Jersey courts would not require First Jersey to have done more than was reasonable or prudent under the circumstances. *See, e.g., McDonald v. Mianecki,* 79 N.J. 275, 298, 398 A.2d 1283, 1295 (1979); *Stark v. National Research and Design Corporation,* 33 N.J.Super. 315, 323, 110 A.2d 143, 147 (App.Div.1954). Given First Jersey's compliance with the prerequisites for indemnification under paragraph 12.7, it cannot be said that a reasonable or

prudent party would have done more than First Jersey did.

**D.** *Dome's Counterclaim for Breach of Contract.*

After the district court granted First Jersey's motion for partial summary judgment, Dome moved for leave to file a counterclaim against First Jersey for First Jersey's breach of the Agreement. The district court denied the motion because it considered the counterclaim to be equivalent to the defenses that Dome raised and the court rejected in First Jersey's action. We agree.

**E.** *Subrogation to First Jersey's Insurer.*

■ Paragraph 16.1 of the Agreement provides that Dome "shall be subrogated to, and entitled to assert, any claim which [First Jersey] may have against any third party with respect to any items reimbursed to [First Jersey] hereunder by [Dome]." Dome argued in the district court, as it argues here, that if Dome is liable as First Jersey's indemnitor, its liability should be offset by its subrogation to First Jersey's insurance claim against Employer's of Wausau. Dome also argues that if a settlement between First Jersey and its insurer has barred Dome's subrogation claim, the settlement discharges Dome's liability under the indemnity clause.

The district court held that Dome's interpretation of the subrogation clause is not plausible because if Dome were subrogated to First Jersey's right against its insurer, it would defeat the parties' intent that Dome, as indemnitor, bear the risk of loss. We disagree. It is at least arguable that the parties intended Dome to indemnify First Jersey only against losses not covered by First Jersey's insurance policy. However, the posture in which this issue is presented precludes its resolution.

Dome did not plead its subrogation claim or move to join Employer's of Wausau. Thus, we cannot reach the "merits" of the subrogation claim. Nor do we believe that the so-called offset claim can be recognized in this action.

We conclude that the subrogation claim must be asserted in an action to which the insurance carrier is a party. The subrogation claim involves the insurer's possible liability, and we deem it an indispensable party to the resolution of such a claim.

As to Dome's contention that the settlement between the insurance carrier and First Jersey effected a discharge of Dome's liability, the short answer is that the merits of that claim can only be effectively determined in an action to which the insurance carrier is a party. Otherwise, the insurance carrier will not have the opportunity to advance its position with respect to the legal effect of its agreement with First Jersey.[7]

### IV.

We will affirm the partial summary judgment for indemnification. We will affirm the order denying Dome's motion for leave to file a counterclaim. We will dismiss for want of jurisdiction First Jersey's premature appeal from the order denying its claim for attorney's fees.

JOSEPH S. LORD, III, District Judge, dissenting.

I agree with the conclusions of the majority (1) that we have no jurisdiction to consider First Jersey's appeal; (2) that the indemnification clause covers breach of contract; (3) that First Jersey was under no duty to minimize its losses; (4) that the denial of leave to Dome to file a counterclaim was proper; (5) that there is no basis on this record for us to consider the merits of Dome's subrogation claim.

However, I would deny plaintiff's motion for summary judgment because I believe that there is a jury question as to whether Rotella's and Ernst's activities constituted "intentional and deliberate misconduct."

The majority's reliance on the standard enunciated in *Lyons v. Hartford Insurance Group*, 125 N.J.Super. 239, 310 A.2d 485 (App.Div.1973), *cert. denied*, 64 N.J. 322, 315 A.2d 411 (1974), in my judgment, is misplaced. In *Lyons*, the court reiterated the public policy of New Jersey that an insurer will not indemnify an individual for damages caused by his own intentional wrongdoing. The obvious purpose of this policy is to avoid any incentive to the insured to commit wrongful acts. A competing policy that runs throughout the *Lyons* opinion as well as that in *Ambassador Insurance Company v. Montes*, 76 N.J. 477, 388 A.2d 603 (1978), and which governs the results in those cases, is that insurance companies should provide broad coverage to innocent victims of insureds.

In order to reconcile these competing policies, the *Lyons* court articulated a definition of intent differing from that appearing in § 8A of the Restatement (Second) of Torts. *Lyons* held that even where there is an exclusionary clause for the intentional wrongdoing of the insured, insurance coverage exists for "the unintended results of an intentional act, but not for damages assessed because of an injury which was intended to be inflicted." Thus, Judge Meanor in *Lyons* would not deny coverage to the innocent victim of an insured who fired a revolver with the intention to shoot over the victim's head. In his concurring opinion in *Ambassador*, Justice Pashman explained that the heightened intent standard adopted by Judge Meanor in *Lyons* would grant insurance coverage to the victims of an insured who, having no subjective intent to injure the victims, set fire to his property in order to collect the insurance money, knowing that it was extremely likely that the victims were asleep in the building. Justice Pashman rejected the use of the Restatement's definition of intent for insurance policy cases. He defended his use of the *Lyons'* "intent" rather than the Restatement definition in insurance cases because the *Lyons* definition is the prevailing one used by the courts in that class of case and,

---

7. Dome protests that the district court abused its discretion by denying Dome's request for adjournment of the hearing on First Jersey's motion for partial summary judgment pending the completion of Dome's discovery with respect to First Jersey's insurer and insurance broker. Our disposition of the subrogation issue moots this contention.

more importantly, because the *Lyons* definition of intent furthers public policy. He stated:

> Since one purpose of such insurance is to protect injured third parties, as between the liability insurer of a culpable actor and an innocent third party it is the better policy to place the risk of loss with the insurer where intent to injure is unclear.

*Ambassador Insurance Co. v. Montes,* 76 N.J. 477, 489, 388 A.2d 603, 609 (1978) (Pashman, J., concurring).

Justice Pashman's reasoning and language clearly limit the use of the *Lyons* definition to cases involving the liability of insurance companies under insurance policies. The majority in *Ambassador,* although not adopting Justice Pashman's opinion, stressed that its purpose for granting coverage was a public policy one—compensation of innocent third party victims where the insured, the wrongdoer, did not benefit from the protection afforded by the insurance. *Ambassador Insurance Co. v. Montes,* 76 N.J. 477 at 486, 388 A.2d at 606. We do not have the *Ambassador* situation in the case before us. In *First Jersey* there is no innocent third party who is an injured victim. Moreover, the very "wrongdoer" is the party seeking compensation. Therefore, extending New Jersey law to apply the *Lyons* definition of intent to this case will further no public policy. Moreover, such an extension would contravene the principle of freedom of contract.

The insurance industry and insurance coverage itself are suffused with public interest. Companies are regulated by the state; the language, coverages and exclusions are governed by state law. Insurance is generally a contract of adhesion and, most important, while ostensibly designed to protect the insured from harm, is in reality, to compensate an innocent and injured victim. In the interpretation of insurance policies, there is a public policy

factor in the whole process. None of these considerations is present here.

In the case before us, there is an arm's length contract between two entities of equal bargaining power. Nor does the state have any policy interest in the indemnity clause. In this situation, it is clear that the parties could choose to allocate the risk of loss to whichever party they pleased.[1]

Applying the principle of contract interpretation that words having "a generally prevailing meaning", will be interpreted "in accordance with that meaning", Restatement (Second) of Contracts § 202(3)(a), the exclusion of indemnification for losses resulting from "intentional and deliberate misconduct" on First Jersey's part does not justify the application of the *Lyons* definition of intent.

First of all, the language in the clause in question here does not focus on the injury, but rather it requires that the *misconduct* be intentional and deliberate. Furthermore, even if there were a question as to whether the contract required that the injury be specifically intended, since First Jersey drafted the indemnification clause, any ambiguity must be construed against First Jersey. *In re F.H. McGraw and Company,* 473 F.2d 465, 469 (3d Cir.1973).

Consequently, I would apply the definition of intent normally employed in civil cases. As set forth in § 8A of the Restatement (Second) of Torts, the word "intent" is used "to denote that the actor desires to cause the consequences of his act, *or that he believes that the consequences are substantially certain to result from it,"* (emphasis added).

According to the Restatement definition, therefore, if a party knows that an intentional act will have a given result or that the result is substantially certain, and that party nevertheless proceeds to act, a jury

1. There is ample legal precedent for treating insurance contracts differently from other contracts entered into by entities with equal bargaining power. "It is settled that any ambiguity or contradiction in an insurance policy *must* be construed against the insurer, and in a manner which is more favorable to coverage." *Buntin v. Continental Insurance Company,* 583 F.2d 1201, 1207 (3d Cir.1978) (emphasis in original).

could find that the result was intentional. In the absence of the need to protect innocent third parties, I think that New Jersey would hold that the intentional act with foreseeable, if not foreseen consequences, falls within the exclusion in the contract.

It is clear that First Jersey stopped time-stamping the incoming tendered materials twice: once in the middle of the offer period and on May 26, 1981, the last day of the period. It is also undisputed that Jan Viise, the vice-president in charge of marketing plaintiff's depositary services, told Anthony Rotella, the supervisor of floor operations on First Jersey's depositary projects, that all tendered materials had to be time-stamped. Rotella admits that he ordered his personnel to discontinue time-stamping on May 26, 1981. Teresa Ernst, a supervisor of the Dome depositary project, admits that she was aware that the time-stamping was stopped on May 26, and that State Street notified her before she mailed out the prorated checks on June 10, 1981 that it had a Brinks receipt dated May 26, 1981 to prove that more than 600,000 shares tendered by it had been rejected improperly. Furthermore, Ernst admitted that when she sent out the checks on June 10, 1981, she was aware of the consequences that would occur if State Street's tenders were rejected improperly. Thus, Ernst knew that there would be an overpayment if State Street's claim was valid, and she nevertheless mailed the checks. From these facts, a jury could conclude that she intended that there be an overpayment because she knew that overpayment was "substantially certain to result" from her intentional act of mailing out the payments. I believe that a jury should have the opportunity to determine First Jersey's right to indemnity.