McKEE, Circuit Judge,
concurring in part, and dissenting in part.
I must respectfully dissent from part III of the majority opinion because I do not agree with the majority’s interpretation of Morton International, Inc. v. General Accident Ins. Co. of America 134 N.J. 1, 629 A.2d 831 (1993), cert denied, — U.S.-, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994). I believe Mar-ton mandates an objective inquiry in disputes such as this. Because the district court’s jury instruction improperly focused on Chemical Leaman’s subjective intent, I would remand this matter to the district court for retrial to determine if “exceptional circumstances” objectively established Chemical Leaman’s intent to cause injury, and if so, whether the extent of the resulting injury was foreseeable.
I. The Evolution of The “Intent” Analysis in “Occurrence-Based” Policies
Although the majority’s analysis has much to commend it, I believe that a more thorough discussion of the evolution of New Jersey’s law in this area is necessary to fully understand Morton. An appreciation of the development of that law casts a different light upon the portions of Morton that control our analysis.
*998 A. Atlantic Employers Ins. Co. v. Tots & Toddlers Pre School Day Care Center, Inc.[1]
Our analysis must begin with, and be guided by a discussion of Atlantic Employers, because it used language that the court would later cite and which I believe has caused my colleagues to take an incorrect analytical turn. In Atlantic Employers, parents of children who had been sexually abused sued the owners and operators of a day care center where the abuse purportedly took place. The company that insured the center then brought a declaratory judgment action to determine its obligation to defend or indemnify the owners for any recovery the plaintiffs might win in their personal injury suits based upon negligence and intentional tort.
The day care center’s insurance policy insured against damage resulting from an “occurrence.” An “occurrence” included injury or damage that was “neither expected nor intended by the insured.” Atlantic Employers, 571 A.2d at 303. The policy also contained an exclusion for violations of penal statutes or ordinances. The Appellate Division first noted the general rule that “coverage does exist ... ‘for the unintended results of an intentional act, but not for damages assessed because of an injury intended to be inflicted.’ ” Id. (citation omitted). The court stated:
There seems to be no dispute that if ... Robert Knighton sexually molested the children, then he had the requisite level of intent to be found guilty of sexual molestation, based on the criminal statutes of this State. But appellants insist that this does not necessarily mean that he intended the damages or injuries incurred by the children as a result of such actions_ Further, they insist that the existence of such intent cannot automatically be imputed to the other insureds under the policy so as to exclude coverage.... We reject this position.
Id. The court then examined cases from other jurisdictions in order to analyze the insureds’ argument in context with developing law. The court noted that some jurisdictions employed a subjective test in determining insurance coverage under these circumstances, and some relied upon an objective test. The court concluded that public policy mandated an objective approach.
As a matter of public policy and logic we conclude that the better rule warrants application of the objective approach. A subjective test suggests that it is possible to molest a child and not cause some kind of injury, an unacceptable conclusion....
... It is simply against public policy to indemnify a person for a loss incurred as a result of his|7her] own willful wrongdoing.
Id. at 304. Thus, the court held that policy, as well as logic, required an “objective approach” as an exception to the general rule.
B. Prudential Property & Casualty Ins. Co. v. Karlinski[2]
Within a year and a half of Atlantic Employers, the Appellate Division decided Kar-linski. There, insured’s 13-year old son (James) had engaged in a prearranged fight with a 14r-year old (Mark) in which Mark had fallen and suffered a broken hip. The court was asked to determine if a homeowner’s policy obligated the plaintiff insurer to defend and indemnify the defendant. The policy excluded coverage for “ ‘bodily injury ... which is expected or intended by the insured.’” Karlinski, 598 A.2d at 919. The motion court granted the insurer’s motion for summary judgment noting that the son of the insured “ ‘instigated the fight and threw the first blow and started the fight. As far as I am concerned, it is intentional conduct and the coverage doesn’t apply.’ ” Id. The motion judge also concluded that “a broken ‘leg’ [Mark actually suffered a broken hip] was not an extraordinary consequence of the fight.” Id.
On appeal the court aptly noted, “[t]he appeal requires that we again explore the frequently visited but still unclearly charted area of liability coverage for intentional torts *999 which produce unintended results.” Id. The court went on to observe:
Our review of New Jersey authorities satisfies us that ... it is difficult to ascertain a clear weight of authority on the subject of liability insurance coverage for unintended results of intentional acts. Differing combinations of variables, such as the language of the exclusion clause, the nature of the harm and its relationship to the intentional act, and the availability of relief to the injured party, appear to influence the extent to which our decisions have inquired into the nature of the intent.
Id. at 921. The court then stated:
[W]e hold that, when a coverage exclusion is expressed in terms of bodily injury expected or intended by the insured, and where the intentional act does not have an inherent probability of causing the degree of injury actually inflicted, a factual inquiry into the actual intent of the actor to cause that injury is necessary.

Id.

C. Voorhees v. Preferred Mutual Ins. Co.[3]
In Voorhees, a parent was sued for statements she had made at a public meeting where she had questioned the competency of her child’s teacher. The teacher claimed she had suffered emotional distress and mental anguish as a result of the parent’s conduct. The teacher alleged that the parent had acted “willfully, deliberately, recklessly and negligently,” in making false accusations that had damaged the teacher professionally, and subjected her to public ridicule. Voorhees, 607 A.2d at 1257. Medical evidence established that the emotional distress the teacher complained of had resulted in “ ‘an undue amount of physical complaints,’ including ‘headaches, stomach pains, nausea, ... [and] body pains.’ ” Id. at 1258.
The parent had a homeowner’s policy that provided coverage for liability arising from “bodily injury” caused by an “occurrence.” The policy defined an “occurrence” as an “accident,” and excluded coverage for bodily injury intentionally caused by the insured. The insurer relied upon this language and refused to defend the insured against the teacher’s suit, asserting that the claims were based on the insured’s intentional act and that the complaint sought damages for a “personal” rather than a “bodily” injury. The parent eventually sued her carrier for damages resulting from its refusal to provide a defense and indemnify her. Both parties moved for summary judgment.
The trial court granted the insurer’s motion ruling that the complaint did not allege the kind of “bodily injury” that would be covered under the policy. A divided panel of the Appellate Division reversed.
The New Jersey Supreme Court noted that the duty to defend under the policy was not triggered “absent a potentially-eoverable occurrence.” Id. at 1262. In assessing whether the insured’s statements constituted a potentially coverable occurrence, the court first held that “the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury.” Id. at 1264. As to what constitutes an “intent to injure,” the court noted that the general trend in the law appeared to require an inquiry into the actor’s subjective intent to cause injury:
We adhere to the prevalent New Jersey rule and hold that the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury. If not, then the resulting injury is “accidental,” even if the act that caused the injury was intentional. That interpretation prevents those who intentionally cause harm from unjustly benefitting from insurance coverage while providing injured victims with the greatest chance of compensation consistent with the need to deter wrong-doing. It also accords with an insured’s objectively-reasonable expectation of coverage for unintentionally-caused harm.
Even if the operative question is the intent to injure rather than to act, the question of what constitutes an “intent to injure” remains. The key issue is whether the court must find a subjective intent to *1000 injure, or whether it can presume an intent to injure from the objective circumstances. In that regard, our inquiry parallels that taken in interpreting policy exclusions for intentional acts. Those exclusions preclude coverage for injuries expected or intended by the insured. Case law interpreting those policy exclusions, in addition to that interpreting the definition of “occurrence,” is thus relevant.
The general trend appears to require an inquiry into the actor’s subjective intent to cause injury. Even when the actions in question seem foolhardy and reckless, the courts have mandated an inquiry into the actor’s subjective intent to cause injury.
Id. at 1264.
The court, however, recognized that:
When the actions are particularly reprehensible, the intent to injure can be presumed from the act without an inquiry into the actor’s subjective intent to injure. That objective approach focuses on the likelihood that an injury will result from an actor’s behavior rather than on the wrongdoer’s subjective state of mind.
Id. at 1265. The Voorhees court reasoned that the insured’s actions there were a far cry from the type of egregious behavior that had justified an objective approach in Atlantic Employers. The court held that “[ajbsent exceptional circumstances that objectively establish the insured’s intent to injure,” the insured’s subjective intent to injure must govern. Id. The Voorhees court’s reference to “exceptional circumstances” was clearly intended to recognize the need for an objective test in the specific circumstances it confronted in Atlantic Employers, and it foreshadowed the test it would proclaim in Morton.
Although the court in Voorhees felt that there was little evidence of a subjective intent to injure the teacher, the court never had to address this question because the plaintiff had also alleged that the insured had acted negligently. The allegation of negligence presupposed the absence of a subjective intent to injure and stated a claim for a potentially coverable occurrence thus triggering the insurer’s duty to defend. See Id. Accordingly, the court affirmed plaintiffs award of summary judgment.
D. SL Industries, Inc. v. American Motorists Ins. Co.[4]
In SL Industries, an employee had filed suit against his employer alleging age discrimination and common law fraud as a result of the employer eliminating his position. The employee sought recovery for the alleged bodily injury that resulted. The employer was insured under a policy in which the insurer agreed to defend and indemnify the employer for all sums resulting from a bodily injury caused by an “occurrence.” “Occurrence” was defined as an “‘accident ... which results in bodily injury ... neither expected nor intended from the standpoint of the insured.’” SL Industries, 607 A.2d at 1269-70.
The employer settled the suit and then brought a declaratory judgment action against its insurer to establish its right to indemnification. The Law Division granted the insurer summary judgment, but the Appellate Division reversed, holding that although intended harm was not covered under the policy, the policy did provide coverage for the unforeseen results of intentional conduct. The court then remanded the case to the Law Division to determine whether the employee’s emotional distress had been intended or whether it was foreseeable.
On appeal, the New Jersey Supreme Court had to determine if the general intent to injure that is inherent in a claim of fraud necessarily incorporates the intent to cause the specific injury (emotional distress), or whether proof of a subjective intent to cause the specific injury is required. Id. at 1277-1279. The court began its analysis of the required intent by examining the differing approaches taken by earlier cases.
Our courts have taken different approaches to the question of how specifically the insured must have intended the result *1001 ing injury. Employing the “Lyons ” test,[5] some courts have held that a subjective intent to injure ends the inquiry and precludes coverage. Under that approach, if there is a subjective intent to injure then any injury that results from the action will be deemed “intentional,” even if the injury is different from or greater than that intended. ...
On the other hand, some courts have indicated that to preclude coverage if the injury that actually occurred was not a probable outcome of the wrongful act is unfair [discussing Karlinski ]_ However, in those circumstances in which the facts indicate that the acts in which the insured engaged were unlikely to result in the degree or type of injury that in fact occurred, an inquiry into the subjective intent to cause the resulting injury is in order.
A third approach is even more likely to lead to coverage. In Hanover Insurance Group v. Cameron [122 N.J.Super. 51, 298 A.2d 715 (Ch.Div.1973)], the court rejected the insurance company’s argument that to preclude coverage only the intent to harm need be demonstrated. The court indicated that “intent” would only be found when the actual consequences that resulted from the act were intended, or when the actor was substantially certain they would result.
To determine which approach to adopt, we refer to the general principles underlying the interpretation of insurance-policy provisions involving intentional conduct.
The Lyons test ... precludes coverage in some cases in which an insured could reasonably expect coverage. When the injury caused significantly exceeds the injury intended or expected and is an improbable consequence of the wrongful act that caused it, then it is hard to characterize the injury as truly ‘intentional.’ The injury, from the standpoint of the insured, is ‘accidental,’ and could thus be deemed an occurrence. Moreover, if the tortfeasor did not intend or expect to cause the resulting harm, denying coverage will not deter the harmful conduct. In that ease, there is no policy justification for denying the victim the possibility of additional compensation. As the Karlinski court noted, precluding coverage ‘even if the actual harm far exceed[s] the consequences which might reasonably be expected by the insured ... diminishes the injured party’s realistic possibility of recovery more than it impacts upon the insured tortfeasor.’
On the other hand, an approach allowing coverage whenever the adverse consequences intended by the tortfeasor did not precisely match the actual consequences of their wrongful actions undermines the basic policy against indemnifying wrongdoers.
We believe the Karlinski test presents the most reasonable approach_ Assuming the wrongdoer subjectively intends or expects to cause some sort of injury, that intent will generally preclude coverage. If there is evidence that the extent of the injuries was improbable, however, then the court must inquire as to whether the insured subjectively intended or expected to cause that injury. Lacking that intent, the injury was ‘accidental’ and coverage will be provided.
Id. at 1277-78 (citations omitted).
Accordingly, the court affirmed the Appellate Division’s judgment remanding the case to the Law Division to determine whether the employee’s emotional distress had been a probable outcome of the insured’s general intent to injure, and if not, whether the insured had the subjective intent to injure the employee. See Id. at 1279.
E. Morton International, Inc. v. General Accident Ins. Co.[6]
Finally, in Morton, the New Jersey Supreme Court had to apply the law of “occur *1002 rence-based” insurance policies to the very different realm of injuries to the environment. There, the insured, Morton International, sued primary and excess CGL insurers seeking reimbursement for costs incurred in defending a suit filed by the Department of Environmental Protection (DEP), as well as indemnity for cleanup and remediation expenses resulting from the DEP proceeding. Morton, 629 A.2d at 834-835. Morton’s predecessors, including Ventrón Corporation, had polluted a body of water known as Berry’s Creek to such an extent that “[f]or a stretch of several thousand feet, the concentration of mercury in Berry’s Creek [was] the highest found in fresh water sediments in the world.” Id. at 834. Morton’s claims were derived from Ventrón as well as other prior owners of the land. See Id. The DEP sued Ventrón and other prior owners to compel them to pay for remediating the pollution of Berry’s Creek and the surrounding area. The environmental damage had been caused by discharges from a mercury-processing plant operated for forty years by the various defendants. See New Jersey Department of Environmental Protection v. Ventron Corp., 94 N.J. 473, 468 A.2d 150 (1983).
In the underlying suit to establish liability, the New Jersey Supreme Court affirmed the Appellate Division’s judgment holding the defendants jointly and severally hable. The court reasoned that the discharge of mercury constituted an abnormally dangerous activity, and imposed strict liability against all defendants. See Id., 468 A.2d at 160.
Morton then commenced a declaratory judgment action to determine its right to indemnification from the various insurers that had provided primary and excess coverage while the mercury-processing plant was in operation. The primary issue that the court had to determine was whether the pollution resulted from an “occurrence” under the applicable policies. To qualify as an “occurrence” the environmental damage must not have been “expected nor intended from the standpoint of the insured.” Morton, 629 A.2d at 836. The trial court granted the insurer’s motion for summary judgment. The Appellate Division reversed holding that the trial court had “focused improperly on the manner in which the injury had been caused and had erroneously concluded that the policy did not provide coverage for the unexpected result of a deliberate act.” Id. at 877 (citation omitted).
The Appellate Division also relied upon Atlantic Employers to conclude that “ ‘[t]he intentional character of the act is the basis for the inference that the insured either intended or was manifestly indifferent to the prospect of injury.’ ” Id. (citation omitted). In reaching this conclusion, the Appellate Division (without the benefit of either Voo-rhees or SL Industries) noted that the “ ‘substantial environmental pollution over a long period’” together with the knowledge by Morton’s predecessors that ‘“the substance being discharged ... was toxic and harmful’ ” rendered unacceptable a conclusion that no harm had been expected. Id. (citation omitted).
On appeal to the New Jersey Supreme Court, Morton argued that the Appellate Division’s reliance on Atlantic Employers improperly equated the discharge of pollutants with child molestation as acts that could be deemed intentionally injurious as a matter of law. Morton further argued that “the Appellate Division improperly invoked an objective standard for determining whether harm had been intended or expected under the ‘occurrence’-based policies, ignoring the longstanding principle that coverage exists for the unintended results of intentional acts.” Id.
The court began its analysis by acknowledging the unique circumstances that surround issues of insurance coverage for environmental damage.
In applying our holding in Voorhees to claims seeking coverage for property-damage caused by environmental pollution under occurrence-based CGL policies, we acknowledge the impracticality of adherence to the general rule that “we will look to the insured’s subjective intent to determine intent to injure.” Although insureds may concede that pollutants — even known pollutants — had been intentionally discharged, those insureds are virtually certain to insist that the resultant harm was unintended and unexpected. Absent *1003 “smoking gun” testimony from a disgruntled employee, proof of subjective intent to cause environmental harm will rarely be available in [environmental insurance] coverage litigation.
We noted in Voorhees that an alternative to proof of subjective intent to injure existed in those cases in which the insured’s “actions are particularly reprehensible, [so that] the intent to injure can be presumed from the act without an inquiry into the actor’s subjective intent to injure.” We cited Atlantic Employers ... as illustrative of conduct that was so inherently injurious as to warrant the conclusion that intent to injure could be presumed.... We are unpersuaded that environmental-pollution litigation should generally be included in that category of cases, typified by Atlantic Employers, in which reprehensible conduct justifies a presumption that injury was intended. Id., 629 A.2d at 879 (citations omitted) (emphasis added).
Instead of relying upon such an unwarranted presumption and thereby extending the “public policy and logic” of Atlantic Employers, the court called for an individualized inquiry based upon the facts of each case.
[I]nsureds held responsible for remediation of environmental pollution vary significantly in their degree of culpability for the harm caused by pollutant discharges. A general rule in environmental-pollution coverage litigation that would permit intent to injure to be presumed simply on the basis of a knowing discharge of pollutants would be unjustified.
Instead, we hold that in environmental-coverage litigation a case-by-case analysis is required in order to determine whether, in the context of all the available evidence, “exceptional circumstances [exist] that objectively establish the insured’s intent to injure.”
Id. at 879-80 (citation omitted) (emphasis added). The term “exceptional circumstances” had been used in Voorhees. As noted above, there, the court stated that, absent exceptional circumstances, the subjective intent of the insured controlled whether there was an “occurrence” under an occurrence-based insurance policy. In Voorhees, the court had stated that it was adopting the majority view that requires proof of a transgressor’s subjective intent. Voorhees at 607 A.2d at 1255.
The court, however, had also noted that “[w]hen the actions are particularly reprehensible, the intent to injure can be presumed from the act without an inquiry into the actor’s subjective intent to injure.” Id. at 1265. In the context of Atlantic Employers, the reprehensible actions of child molestation did indeed “ ‘[a]s a matter of public policy and logic ... warrant! ] application of the objective approach.’ ” Id. Then, the court used the language that separates me from my colleagues. The court added: “[a]bsent exceptional circumstances that objectively establish the insured’s intent to injure, we will look to the insured’s subjective intent to determine intent to injure.” Id. (emphasis added).
II. Morton Applied to the Instant Dispute
In Morton, the court was careful to distinguish the policy considerations in pollution coverage cases from those that dictated an objective approach in all cases of child molestation. ‘We are unpersuaded that environmental-pollution litigation should generally be included in that category of cases, typified by Atlantic Employers, in which reprehensible conduct justifies a presumption that injury was intended.” Morton, 629 A.2d at 879. This does not mean, as the majority suggests, that the alleged polluter’s subjective intent controlled. It only means that the act of polluting is not so reprehensible that “public policy and logic” require a presumption that the resulting harm is intended as a matter of law. Rather, the circumstances surrounding the act of polluting must be examined in each case to determine if, in that particular situation, they objectively establish an intent to harm the environment, thereby negating an occurrence.
The court then listed those circumstances that would objectively establish this intent.
Those circumstances include the duration of the discharges, whether the discharges occurred intentionally, negligently, or innocently, the quality of the insured’s knowl *1004 edge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured’s conduct, and the existence of subjective knowledge concerning the possibility or likelihood of harm.
Id. at 880. Accordingly, I cannot agree when my colleagues state, “[w]e believe the New Jersey Supreme Court designed the ‘exceptional circumstances’ exception to apply only to egregious conduct.” Majority Op. at 989. One can only determine if conduct is egregious by examining the “exceptional circumstances” in which it occurred. Indeed, an examination of those circumstances may well establish that a particular polluter’s conduct was not egregious at all.
The majority’s error is reflected in what the court in Morton did. It did not require proof of the subjective intent to pollute on the part of the insured or its predecessors. Rather, it examined the record and determined that the circumstances before it objectively established an intent to harm. “In determining whether in the context of this record the trial court properly concluded, as a matter of law, that Morton’s predecessors had intended or expected environmental injury, we focus on those factors [i.e. the “exceptional circumstances”] that we previously have identified to be significant.” Morton, 629 A.2d at 882. The court then noted the duration of the discharge, the intentional nature of the discharge, the insured’s knowledge of the likely environmental harm, and the history of “stonewalling.” In conclusion, the court noted that its examination of these circumstances confirmed that “damage qualitatively comparable to that found to exist ... must have been anticipated by Morton’s predecessors on the basis of ... prolonged knowledge of and avoidance of compliance with complaints by regulatory officials.” Id. at 884.
This is consistent with the court’s pronouncement that the mere fact of polluting, even to the egregious extent present in Morton, was not by itself, such reprehensible conduct that it required a conclusive presumption of an intent to harm. Moreover, the “exceptional circumstances” include “the existence of subjective knowledge concerning the possibility or likelihood of harm.” However, subjective knowledge is not used to definitively determine if the insured expected or intended environmental damage. Rather, the insured’s subjective knowledge is but one of those “exceptional circumstances” that determine if an “occurrence” has taken place. It is not the start and finish of that inquiry as the majority’s reasoning suggests.
The Morton court concluded that exceptional circumstances established as a matter of law that there had been no occurrence as Morton’s predecessors had to have expected the pollution they caused. The objective nature of this conclusion is evident because the court clearly stated that is was not deciding whether Morton’s predecessors “intended” (i.e.“subjectively”) the damage:
Without determining that such damage was intended, we find inescapable the conclusion that damage qualitatively comparable to that found to exist in the Ventrón litigation must have been anticipated by Morton’s predecessors on the basis of their prolonged knowledge of and avoidance of compliance with complaints by regulatory officials that the company was discharging unacceptable emissions, including mercury compounds, into Berry’s Creek. Based on that conclusion, ... as a matter of law the property damage to Berry’s Creek and the surrounding area was not caused by an “occurrence” within the meaning of the term in the various CGL policies.
Id. at 884 (emphasis added).
In adopting prior law (particularly the holding in Karlinski) to environmental insurance coverage, the court in Morton noted that subjective evidence of the polluter’s intent did not become relevant merely because the extent of pollution was greater than anticipated.
Turning to the question whether environmental injury was intended or expected, we first observe that although the magnitude of the damage to Berry’s Creek and the surrounding areas may exceed any intention or expectation attributable to Morton’s predecessors, we do not consider that differences in harm relating to the severity of environmental damage give rise to a finding of “improbability” of harm that in *1005 vokes the need for evidence of subjective intent. Whether Morton’s predecessors anticipated that discharges of untreated effluent on the plant site and into Berry’s Creek for more than forty years would cause environmental harm of the severity described ... hardly demonstrates that the extent of the injury was “improbable.” The holding in SL Industries was based on the Appellate Division’s ruling in Karlin-ski that in a coverage action arising from a fight between two young teenagers in which one sustained a broken hip, a factual issue of subjective intent was presented because of the inherent improbability that the skirmish would result in a hip fracture. No such inherent “improbability” can be ascribed to the environmental damage attributable to Morton’s predecessors.
Id. at 882 (citations omitted).
The majority notes that the district court held that
Chemical Leaman’s actions were not so reprehensible as to justify the presumption of an intent to cause property damage under the “exceptional circumstances” exception. It concluded that Chemical Lea-man was not “throwing toxic waste out into the meadow-lands” as Morton and its predecessors had done; rather, it had “designed and built the facility to prevent [harm to the environment].”
Majority Op. at 985-86. (emphasis added). The “exceptional circumstances” test, however, is not an “exception,” but the rule that is to be applied in environmental coverage cases. In addition, although Chemical Lea-man was not reducing Berry Creek to one of the world’s great environmental disasters as was the ease in Morton, there is nevertheless testimony from which a reasonable jury could conclude that “exceptional circumstances” objectively establish Chemical Lea-man’s intent to harm the environment.
The majority holds that after Morton, a court can determine that an insured is entitled to indemnification under an occurrence-based policy as a matter of law absent “exceptional circumstances.” My colleagues suggest that “exceptional circumstances” merely
define when no reasonable jury could find the insured did not intend or expect to cause property damage because objective circumstances — evidence of prolonged, intentional, or flagrant discharges of known pollutants in the face of regulatory disapproval — establish that the insured must have intended property damage. The presence of “exceptional circumstances” requires a court to enter judgment as a matter of law. Their absence, of course, does not prevent a jury from finding an insured “expected” or “intended” to cause property damage.
See Majority Op. at n.7. However, Morton did not quantify the factors it identified as objectively establishing intent to pollute. Rather, the “ease-by-case analysis” was necessary for the fact finder to make an individualized determination of whether the nature of those factors in a particular ease justified denying coverage in lieu of the limitations contained in the insurance contract. Thus, I agree that the absence of the factors detailed at footnote 7 of the majority opinion “doe[ ] not prevent a jury from finding an insured ‘expected’ or ‘intended’ to cause property damage,” but not for the reason stated by the majority. Rather, it is because “subjective knowledge concerning the possibility or likelihood of harm” is one of the “exceptional circumstances” that a jury must also consider. Accordingly, if an insured knows that its actions will most likely harm the environment, just one, brief, discharge of a known pollutant by one who had otherwise complied with regulatory authorities could preclude coverage under an occurrence-based insurance policy.
The majority argues that Morton cannot be read as creating an objective test for intent because an insured who “intentional[ly] discharges a known pollutant generally intends ‘some sort of harm,’ however de min-imis, and the harm that actually results is usually a probable result of the discharge.” Thus, (the majority suggests) an objective test “would result in a general rule precluding [all] coverage based on the knowing discharge of a pollutant.” Majority Op. at 987. That is, however, precisely why it is necessary to use “exceptional circumstances” to prove intent to harm objectively in pollution *1006 cases. If the resulting inquiry establishes that the insured did objectively “intend” to harm the environment, the inquiry into the foreseeability of the actual damage makes perfect sense.
The majority expresses a further concern that reading Morton to require anything other than subjective intent “would be akin to a negligence standard [,and] [i]f negligent acts did not fall within the definition of a covered occurrence, then there would be no point in purchasing comprehensive general liability insurance.” Majority Op. at 985 (citing Pittston Co. v. Allianz Ins. Co., 905 F.Supp. 1279, 1301 (D.N.J.1995)). A properly guided inquiry into “exceptional circumstances,” however, does not equate with a negligence standard. It assigns the cost of environmental remediation not based upon negligence, but upon the “degree of culpability for the harm caused by pollutant discharges.” Morton, 629 A.2d at 879.
III. The Exceptional Circumstances of The Bridgeport Site.
Throughout the time the pond and lagoon system was in use there were repeated discharges of waste through the overflow pipe to the adjacent swamp. In fact, the very purpose of the overflow pipe was to allow for these discharges. An Inspector observed the discharge from the last pond during a September 12,1961 visit and thereafter observed similar discharges on about half of his visits to the Bridgeport site. In November 1968, water pollution inspectors from the New Jersey Department of Health again observed the discharge from the overflow pipe in the last lagoon. Although it was characterized as a sporadic “trickle”, an engineer employed by Chemical Leaman (Elston), and at least one other employee admitted that the overflow pipe did discharge into the swamp throughout the time the pond and lagoon system was in use. Moreover, there was evidence that by 1974, the path of this “trickle” from the last impoundment could “be easily seen by looking for a 75-foot wide lane of dead trees” in the swamp.
The Morton court concluded that the discharge of pollutants there was intentional once the polluters knew it was unacceptable. Morton, 629 A.2d at 882. There, the repeated demands of the Department of Health that the owner halt the discharges or install adequate treatment facilities were regularly ignored. Id. Here, the intentional nature of the discharge is also evident. Chemical Lea-man intentionally designed its waste treatment system so that the overflow pipe would discharge into the swamp. Furthermore, even under the subjective framework that the jury was given to review the evidence, it concluded that Chemical Leaman’s releases were intentional. That conclusion is supported by the record and Chemical Leaman cannot now successfully argue that the discharges were anything but intentional. Indeed, Chemical Leamaris denials illustrate the concern expressed in Morton that a polluter may admit to the discharge, but would never admit to intentionally polluting the environment. That concern could only be satisfactorily addressed by the objective test that the majority today rejects.
Here, as in Morton, the intentional nature of the discharge is confirmed by Chemical Leamaris continued evasion of the State’s demands to stop the discharge. The unacceptable condition of the discharge from the overflow pipe into the swamp was brought to Chemical Leaman’s attention by a governmental inspector in September of 1961. Although Chemical Leaman installed three more lagoons in an attempt to alleviate this situation, the overflow pipe remained a staple of the Bridgeport site and in 1968, Chemical Leaman was still discharging wastes into the lagoon.
State officials regularly informed Chemical Leaman that the effluent flowing from the overflow pipe constituted an unacceptable discharge into the swamp. In 1961, FGW told Chemical Leaman that the discharge was an unacceptable condition and that the resulting pollution should be stopped within a year. Subsequently, in 1968, the NJDOH told Chemical Leaman that “the waste emanating from the lagoon is highly pollutional and [that] immediate measures [should] be taken to eliminate this discharge or to sufficiently treat the waste prior to discharge” and in 1969, Chemical Leaman was ordered *1007 to find an alternative method of waste treatment.
Chemical Leaman argues that it was not aware of the harmful propensities of its pollutants because it was not discharging pure chemicals, but rather “trace amounts” of these chemicals in highly diluted rinsewater. The uncontroverted evidence, however, clearly showed that at least by 1968, Chemical Leaman was alerted that the discharge into the swamp was “highly pollutional” even in its diluted form. Furthermore, as noted above, however diluted the discharge may have been, it was sufficiently potent to sculpt the 75-foot wide path of dead trees into the environmental landscape it touched.
It is certainly true that Chemical Leaman is more sympathetic than the polluters in Morton, who engaged in a deliberate pattern of “stonewalling” characterized by promises of compliance that went unfulfilled. Morton, 629 A.2d at 882. As the majority notes, Chemical Leaman apparently thought that its natural filtration system would reduce the danger of pollution. In fact, it was designed to do just that. Nevertheless, the record here could clearly support a finding that Chemical Leaman was “stonewalling” regulatory authorities. There is a pattern of unfulfilled promises of compliance to state agency requests to abate the polluting discharge.
Even after officials caught Chemical Lea-man discharging into the swamp in 1968 and ordered it to find a better way to treat wastes in 1969, Chemical Leaman did not improve the waste treatment system until the summer of 1975, when it entered into a disposal contract with Du Pont. In the interim, 40 to 50 million gallons of contaminated waste water had been processed using the same treatment system.
Thus, from 1961, when the State first notified Chemical Leaman that the discharge to the swamp was unacceptable, until 1975, when Chemical Leaman began off-site disposal at the Du Pont plant, Chemical Lea-man responded to regulatory agencies with promises of compliance that went unfulfilled. Chemical Leaman was informed that the discharge to the swamp was unacceptable. Although the state did not articulate why the discharge was improper, it is difficult to imagine what other reason Chemical Leaman could have attributed to the state’s concern if not the impact of the discharge upon the environment. It is clear from Chemical Lea-man’s own argument in this regard that it never attempted to ascertain the reason for the State’s concern.
Nevertheless, assuming arguendo that in 1961 Chemical Leaman could not ascertain that its system was damaging the environment, there is no dispute that Chemical Lea-man learned that the discharges to the swamp were likely to cause harm as of November of 1968, when it was expressly told that “the waste emanating from the lagoon is highly pollutional and [that] immediate measures [should] be taken to eliminate this discharge or to sufficiently treat the waste prior to discharge.” Even more telling is Harry Elston’s concession at trial that both at the time of Few’s inspections in 1961 and 1962, and at the point when NJDOH issued its order in 1969, he knew that Chemical Lea-man’s discharge into the swamp was causing some damage to the swamp. Finally, it should be noted that Chemical Leaman never obtained the required permits for its waste disposal cite. Thus, it took regulatory authorities even longer to discover the “highly pollutional” discharge. Once the cite was discovered, Chemical Leaman’s compliance with regulatory agencies was less than exemplary.
Chemical Leaman discharged approximately 100 million gallons of contaminated waste water into its unlined ponds and lagoons for the fifteen years that the Bridgeport site was in operation. The bottom of those lagoons was only two and a half feet above the groundwater, and the insurers’ expert testified that the soil, groundwater, and swamp contamination was the probable result of this discharge. That testimony was not refuted by Chemical Leaman’s expert even though Chemical Leaman argues on appeal that their unlined treatment system was the state of the art.
I cannot say that such a course of conduct does not negate the existence of an occurrence under New Jersey law.
*1008 IV. Conclusion
Courts that have addressed the issue of the kind of intent that would negate insurance coverage under an occurrence-based policy have been guided by certain policy considerations. Courts have attempted to maximize the possibility that victims be compensated for their injuries while minimizing indemnification of the wrongdoer. See Voorhees, 607 A.2d at 1264. They have also been concerned that the law in this area deterred wrongdoers. See SL Industries, 607 A.2d at 1278. Looking to “exceptional circumstances” to objectively determine intent to harm the environment does just that. To the extent that those circumstances suggest that the insured did not intend environmental harm, and cooperated with regulatory authorities to avoid it, the insured will likely be indemnified for the cost of remediation under an occurrence policy even where it discharged a known pollutant. To the extent that those circumstances establish a protracted and/or deliberate discharge, however, a disregard for the environment, knowledge of the properties of a pollutant, “stonewalling” regulatory agencies and the insured’s subjective knowledge of the possibility of harm; “public policy and logic”[7] require that the insured, and not its insurers, pay the cost of environmental cleanup. That allocation of cost deters persons from closing their eyes to the environmental impact of their activities.
Furthermore, this is consistent with the long-standing doctrine of enforcing insurance contracts in a manner that is consistent with the reasonable expectations of the parties. An insured cannot reasonably expect to escape the “occurrence-based” limits on its right to indemnification where “exceptional circumstances” establish its culpability for pollution. Similarly, an insurer should be able reasonably to expect that it will not be required to reimburse such a polluter for the environmental damage so callously caused.
This is the result the New Jersey Supreme Court sought to promote in Morton. Yet, the rule we adopt today will give polluters comfort and allow them to discharge pollutants in relative safety because of the obvious impraeticality of establishing their subjective intent to harm the environment. Since the New Jersey Supreme Court recognized the impraeticality of a subjective approach in environmental coverage disputes, I find it difficult to believe that it intended this result.[8] The majority concludes that the New Jersey Supreme Court established a subjective standard in environmental insurance disputes while proclaiming such a rule to be so impractical as to be unworkable. As a result, our holding places insurers in the impossible situation the New Jersey Supreme Court sought to avoid by its thoughtful pronouncement of an objective “exceptional circumstances” test in disputes over liability for cleaning up pollution.
Present BECKER, STAPLETON, MANSMANN, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, McKEE and SAROKIN, Circuit Judges.

. 239 N.J.Super. 276, 571 A.2d 300 (App.Div.), cert. denied, 122 N.J. 147, 584 A.2d 218 (1990).

. 251 N.J.Super. 457, 598 A.2d 918 (App.Div.1991).

. 128 N.J. 165, 607 A.2d 1255 (1992).

. 128 N.J. 188, 607 A.2d 1266 (1992). SL Industries summarizes and explains the evolution of the law of coverage under “occurrence-based” policies in New Jersey, and I will therefore take the liberty of quoting at length from that opinion.

. The test derives its name from Lyons v. Hartford Ins. Group, 125 N.J.Super. 239, 310 A.2d 485, 488-89 (App.Div.1973).

. 134 N.J. 1, 629 A.2d 831 (1993), cert. denied, -U.S.-, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994). The majority and I agree on the significance of certain portions of the opinion in Morton, but disagree as to the meaning of the language. Since it is difficult to eliminate all repetition in explaining why I disagree, I will be somewhat redundant in discussing Morton.

. See Atlantic Employers, 571 A.2d at 304.

. Indeed, the difficulty with the approach we adopt is even greater than was expressed in Morton because the "smoking gun testimony from a disgruntled employee” often needed to establish subjective intent would surely be subject to effective impeachment by any decent litigator. Thus, although the employee’s antagonism may motivate him or her to provide the evidence necessary to establish the employer’s intent to pollute, it would also establish bias and motive to fabricate testimony and thereby minimize that testimony’s probative value.